UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

ANTHONY W. HIGGS,                )
                                 )
       Plaintiff,                )
                                 )
              v.                 )      Cause No. 2:21-CV-164-PPS
                                 )
MICHAEL REPAY, *et al.*,         )
                                 )
       Defendants.               )

**OPINION AND ORDER**

In September 2020, Lawrence Clark, an employee in the housekeeping

department for the Lake County courthouse in Hammond, filed a report with the

Hammond Police Department claiming that his supervisor, Anthony Higgs, had made

sexual advances towards him and that Higgs was following him and showing up

uninvited at his house. A few weeks later, on October 2, 2020, Clark filed a grievance

with his employer, Lake County, claiming that Higgs was harassing him. Matthew

Fech, an attorney for the Lake County Board of Commissioners, met with Clark, Higgs

and the judges in the Hammond courthouse to investigate the claims. Fech prepared

and submitted a written report to the Board, recommending that Higgs be terminated.

Higgs was subsequently fired from his at-will position as an engineer supervising

building operations and maintenance at the Hammond courthouse.

Higgs claims that he was wrongfully terminated in an attempt to destroy his

integrity and reputation due to his desire to run for political office that he had

announced some eight months earlier. He further claims that his termination constitutes

intentional discrimination on the basis of his sexual orientation. Higgs has sued the three Lake County Commissioners, both individually and in their official capacities. He also seeks relief against Lake County itself, and Mr. Clark. [DE 1.] There are four claims: (1) a First Amendment retaliation claim asserted against Repay under 42 U.S.C. § 1983 [*id.*, ¶¶ 21–25]; (2) a Title VII claim against all three Commissioners for discrimination on the basis of Higgs' sexual orientation [*id.*, ¶¶ 26–34]; (3) another § 1983 claim asserted against Lake County and the Commissioners for violation of Higgs' due process rights [*id.*, ¶¶ 35–43]; and a state law claim of defamation against all Defendants [*id.*, ¶¶ 44–52].

Lake County and the Commissioners seek summary judgment [DE 38], asserting that there is no genuine triable issue as to any of the claims against them.[1] For the reasons explained in this Opinion and Order, Higgs fails to meet the burden to survive summary judgment on the federal claims, and they will therefore be dismissed with prejudice. I will also relinquish jurisdiction over the supplemental state law claim.

**Undisputed Facts**

Higgs started working for Lake County in February 2004 in the role of Deputy Clerk. Higgs left the Clerk's Office to work for the Lake County Board of Commissioners in December 2014, serving as an engineer in Hammond overseeing

---

[1] Defendant Clark has not appeared to defend this action. Service was attempted on Clark but a process server was unable to locate him. [DE 11.] An alias summons was issued June 23, 2022 [DE 13; DE 16], and on July 11, 2022, Higgs' counsel filed an affidavit stating that Clark was served with a copy of the complaint and summons on June 28, 2022 [DE 18]. Higgs moved for clerk's entry of default and I directed the Clerk to enter a default against Clark pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. [DE 31; DE 32; DE 33.] Since the Clerk entered the default, Higgs has not moved for entry of default judgment against Clark.

building operations and maintenance at the Lake County courthouse. Higgs was an at-will employee, meaning that he was free to resign at any time and the County could terminate his employee "at any time pursuant to County policy." [DE 38-3 at 38.] Clark started working in the housekeeping department at the Hammond courthouse on August 20, 2018, and he reported to Higgs.

In January 2020, Higgs filed to run for election as state representative. He met with Commissioner Michael Repay in February 2020 to discuss his decision to run against incumbent Caroline Jackson in the 1st District of Indiana. Repay told Higgs that he was concerned about this plan because Higgs "was coming off of a loss" in another election and "would be better served politically to take a break, evaluate, and try and figure out what politically could be done better to be more successful." [DE 38-4 at 4–5.] Repay said that Jackson was a "mutual friend" and that he would support her in the election because she was the incumbent and had done a good job as state representative. *Id.* at 5-6. Evidently, Higgs did not heed Repay's advice; he did run and lost to Jackson in the primary, which was held in May 2020.

Clark and Higgs had a challenging relationship. For example, on June 15, 2020, Clark filed a grievance with Danielle Royster, the County's Human Resources Director, claiming that another employee (Timothy Wagner) was disrespectful to him. [DE 38-5 at 5–6.] Clark complained that Higgs condoned or did not take action to address the statements made by Wagner. *Id.* Clark's concern was that Wagner was repeatedly calling him "boy," "black ass," or "the black guy," instead of by his name. *Id.* Clark

considered his work environment to be a "hostile" one that he was finding "unbearable." *Id.* He asked for "clear direction and support from [his] supervisor Mr. Higgs," to make sure he didn't have to "do double work" to accommodate Mr. Wagner. *Id.* On September 3, 2020, Clark submitted another "Incident Report." In this report, Clark claimed that a coworker became ill and threw up in the courthouse. Clark's complaint was that he brought this to Higgs' attention, and Higgs "blew it off." [DE 38-6 at 17.]

It wasn't always Clark that was the one doing the complaining. For his part, Higgs submitted several "Employee Corrective Action" forms against Clark. [DE 38-3 at 6–10, 14, 18, 21, 25.] For example, on September 17, 2020, Higgs wrote Clark up for insubordination for leaving the building without a radio for an hour and recommended Clark's "suspension/termination." *Id.* at 18. Clark was suspended for three days following the September 17 incident. Six days later, Clark was again written up for insubordination relating to his failure to complete a tiling job at courthouse. *Id.* at 14. In response, Clark claimed that the only reason he didn't finish the tiling job was because one of the judges was having a meeting at the time and asked him to complete the job at a different time. *Id.*

A couple weeks later, the low-grade feud between Higgs and Clark was taken to the next level. Clark filed a police report against Higgs with the Hammond Police Department. In the report, Clark alleged Higgs "keeps following [him] and trying to get [Clark] to go out with [him] on a date," and that Higgs had made sexual advances

4

toward Clark that had been rebuffed. [DE 38-3 at 29.] Higgs had been "showing up in front of [Clark's] house," and had "called and texted [Clark] several times after being told to stop." *Id.*

On October 2, 2020, Clark followed up the police report with another employee grievance form alleging Clark was harassing him. [DE 38-3 at 26–28.] He complained that Higgs had written him up for no good reason on September 16 and September 23 and spoke disrespectfully to him on September 24. He concluded by saying that Higgs had "repeatedly embarrassed and disrespected" him in front of his peers and courthouse patrons and he had been "suspended for no reason." *Id.* at 28. Clark pointed to the September 23 incident as an example. *Id.* at 27. Recall that he had been written up that day for insubordination, but he was simply following a judge's direction to delay a repair job. Higgs had directed Clark to repair tiles in one of the courtrooms but the judge directed Clark to come back later when the courtroom was not in use. Clark went to clean bathrooms and Higgs became angry at him, stating that he was "the boss and you do what I tell you. The judges don't run nothing." *Id.* Clark went back to the courtroom and Higgs came in with another employee and directed the other employee to complete the work, then handed Clark a written reprimand. Higgs then called his supervisor and told him that Clark "was not doing as he was told." *Id.* Clark pushed back on this and Higgs yelled at him, telling him to leave. Higgs followed Clark and yelled, "You need to go home and get the f– out of the building." *Id.*

The next day, Clark stated that Higgs embarrassed him in front of a team of contractors, who had arrived at the courthouse and could not find Higgs for over an hour. *Id.* at 28. Clark spoke with the contractors and showed them around the courthouse. Higgs arrived later and told Clark to clean bathrooms. Higgs allegedly told the contractors not to listen to what Clark had told them and that he was the boss.

With all the back and forth going on between Higgs and Clark, eventually the county attorney, Matthew Fech, got involved. In particular, after the police report was filed by Clark in September, Fech contacted Higgs and interviewed him on October 7, 2020. [DE 38-2 at 28.] Fech memorialized the conversation in a report submitted to the Board of Commissioners on October 13, 2020. *Id.* at 28–29. The County's Human Resources Director, Ms. Royster, was present at the interview. *Id.* at 28. Higgs denied the allegations in the police report and told Fech that Clark "would sometimes not come into work, would arrive untimely to work or would be 'MIA' when individuals throughout the building would need his assistance." *Id.* Fech asked Higgs about the vomit incident on September 3, and Higgs stated that he "immediately cleaned it up" himself. *Id.* Fech noted in his report that this did not check out—a report signed by a judge in the courtroom where the incident occurred stated that another employee, not Higgs, had cleaned up the mess. *Id.* After speaking with Higgs, Fech inquired of various judges in the Hammond courthouse and wrote in his report that it was Higgs who was "frequently absent" and "not reliable" when needed, and that, by contrast, Clark was "an 'outstanding employee' and 'always willing to help' when needed." *Id.* at 29.

After speaking with the judges, Fech met with Clark. Fech reported that Clark "did not have the text messages complained of because he lost his phone," but "did have a video/audio recording of a conversation between himself and Mr. Higgs in regards to changing his schedule" without notice required in the Lake County employee handbook, an issue that Royster had previously addressed with Higgs. *Id.* at 29. Clark showed Fech the recording. [DE 38-6 at 2, ¶ 4.] In his memorandum, Fech noted that Clark told him that Higgs would "constantly question" where Clark had parked his car at the courthouse, which led Clark to believe that "Higgs is following him or, at the very least, would look for where Clark parked on any given day." [DE 38-2 at 29.] While there was "no actual proof" substantiating this claim, Fech determined that "Clark's assumptions do not seem unreasonable." *Id.* Based on his conversations with Higgs, Clark, and the judges, Fech believed Clark's claims in the police report were true. [DE 38-6 at 3, ¶ 5.] Fech therefore concluded that there was "sufficient reason to terminate Mr. Higgs for cause." [*Id.*; DE 38-2 at 29.]

After receiving the report, the Commissioners directed Fech to terminate Higgs' employment. [DE 38-2 at 5.] Fech met with Higgs and told him that he was fired. After he was told about his termination, Higgs "left the building" and took with him "all [his] documentation out of" his and Clark's personnel file. [DE 38-1 at 17–19.] Defendants have submitted a Declaration from Joe Travis, an employee in the County's HR Department, stating that Higgs' actions in intentionally removing the personnel files without authorization would constitute a violation of Lake County's Guidelines for

Conduct, Category IV [DE 38-5 at 3, ¶ 7], which would subject Higgs to "immediate dismissal" under the employee handbook. [*See* DE 38-3 at 82.] Higgs later received a letter from Royster dated October 19, 2020, formalizing his termination from the County effective October 13 "due to [Higgs'] performance, which does not meet [the County's] expectations," and noting that "as an at-will employee, Lake County has the right to end employment at any time, with or without cause." *Id.* at 107.

On October 15—after Higgs had been verbally notified of his termination, but prior to Royster's letter—a local reporter, Lauren Cross, sent a public records request to Fech under Indiana's Access to Public Records Act, seeking information about Higgs. [DE 38-6 at 6.] Cross emailed Fech stating that she had "received a tip" that Higgs was "fired this week for sexual harassment." *Id.* She asked Fech to confirm whether that was true, whether the decision was within the Commissioners' discretion, and whether a police report had been filed and an internal investigation undertaken with respect to the allegations. *Id.* Cross also referenced a records request she had made for "the name, compensation, job title, job description, education and training background, previous work experience, or dates of first and last employment of Mr. Higgs; information relating to the status of any formal charges against Mr. Higgs; the factual basis for a disciplinary action in which final action has been taken and that resulted Mr. Higgs being suspended, demoted, or discharged." *Id.*

At his deposition, Fech testified that he determined a response was required stating a factual basis for the termination decision. [DE 38-2 at 6–7.] *See* Ind. Code § 5-

14-3-4(b)(8). Fech responded to Cross via email by attaching the report he submitted to the Board of Commissioners and a list of specific information about Higgs' term of employment. [DE 38-6 at 7.]

Cross published an article in the Hammond Times on October 15, 2020, with the headline, "Higgs fired for sexually harassing, stalking male co-worker, county memo alleges." [DE 38-2 at 20–24.] The article stated that Higgs had been fired for "allegedly stalking and making sexual advances toward a male coworker while on the government clock." *Id.* at 20. Cross attributed this information to "a county memo . . . written by Matthew Fech to the Lake County Commissioners," and noted that the County was unaware whether formal criminal charges would be filed in connection with the employee's police report. *Id.* Cross wrote that Higgs "was often the subject of multiple allegations of aggressive and erratic behavior, including making *threats against Hammond officials* and *harassing supporters of political opponents* – and a host of other controversies" (the italicized statements do not appear in any of the information Fech provided to Cross). *Id.* (emphasis added). Cross reiterated Clark's allegations, citing the Fech's memorandum, Clark's employee grievances, and the police report. *Id.* at 21–23. The article then listed, under the subheading "[p]ast controversies," a series of incidents from May 2014 to February 2019 in which Higgs was "accused of erratic behavior, harassment and unprofessional conduct" (again, there is no support for this statement in any of the information Fech provided). *Id.* at 23–24.

After the article was published, Higgs, by counsel, submitted a Request for Mediation pursuant to provisions in the Lake County Employee Handbook. [DE 38-2 at 25–26.] The request was made "for the purpose to [*sic*] address the falsified allegations that has [*sic*] led to the wrongful suspension and termination of Anthony W. Higgs." *Id.* at 26. Fech testified that a hearing was held on the mediation request. Higgs, his counsel, Fech, and Royster attended. [DE 38-2 at 16–18.] Fech recalled that the purpose of the meeting was "what could be done to return Mr. Higgs to his employment status" with Lake County, and that "the focus" of the conversation was on Higgs' job performance and Clark's allegations. *Id.* at 23. On October 26, Higgs was sent a paycheck with 80 hours of regular pay, and on November 9, he received his final paycheck with "longevity" pay. [DE 38-5 at 3, ¶ 5.]

At his deposition, Higgs testified that he had a "feel[ing]" that Repay had encouraged Clark to file a police report and did this "intentionally . . . to remove [Higgs] from [his] position." [DE 38-1 at 14.] Asked about what role Tippy, Allen Sr., and Repay played in terminating his employment, Higgs stated that he was not present when the trio "had any discussion," but was "sure they were made aware of" the decision to terminate his employment – he "assum[ed] they discussed everything." *Id.* at 23–24. Higgs also suggested that he was the victim of political sabotage. He stated his belief that he had lost elections in the past due to "false [accusations] that were presented" by "reporters in the newspapers," and because "some of the council members were doing . . . all kind of evil and vindictive things." *Id.* at 3. He specifically

10

referenced claims by a councilwoman who "said that [Higgs] threatened her" another incident involving a young woman who claimed Higgs had "threatened her at a back-to-school event," and a situation where he "was censored by the council for some crazy thing" he could not remember because "it was so ridiculous." *Id.* at 3–4.

Before he started working for the Board of Commissioners, Higgs testified that he "changed jobs from deputy clerk to office manager at the sheriff's office" because he was "being harassed" at the clerk's office. [DE 38-1 at 6.] He identified a coworker in the clerk's office named Kim, who he believed was "planted" in the office to "irritate . . . and agitate" him to "try to make [him] go off." *Id.* at 7. Higgs explained that he "had to switch offices in a number of positions because" coworkers would be "planted" in different offices "to specifically bother [him] and try to agitate [him] to the point where [he] would be aggressive or create a scene." *Id.* He did not attribute the "planting" of employees to anybody in particular, saying it "[c]ould have been a number of people." *Id.* Higgs was asked directly whether he could identify any evidence suggesting that he was being harassed at work "because of politics" or "something else other than politics," beyond his personal feeling that he was being intentionally harassed at work, and he conceded that he could not identify any. *Id.* at 8.

Since his termination and the filing of this lawsuit, Higgs has served as a precinct committeeman, a role he has held "for 30 years." [DE 38-1 at 12.] He testified that he won reelection to the position in May 2022, following his termination and the publication of the Hammond Times article. *Id.* Higgs applied for jobs at Amazon, a

funeral home, and "looked around at a couple of places," but due to the COVID-19 pandemic, " a lot of people weren't hiring." *Id.* at 9. He stated that he suffered from depression, anxiety, and stress as a result of his termination and "couldn't even function" some days, making it harder to find work. *Id.* at 10. Higgs has not actively sought work since November 2021, when he was awarded disability benefits. *Id.* at 10–11. As we'll see in a moment, Higgs' post-termination efforts (or lack thereof) to secure employment are important to the question of whether his termination stigmatized him to the point of making him unemployable.

## Standard for Summary Judgment

The defendants seek summary judgment, which is governed by Rule 56. It provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of *some* alleged factual dispute between the parties," *id.* at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

Prior to briefing on summary judgment, the parties were notified that compliance with this court's local rule governing summary judgment procedure had been amended to require Statements of Material Facts to be formatted in a particular way to "increase the clarity of the summary judgment record and avoid obfuscation as to whether facts are genuinely disputed." [DE 37.] *See* N.D. Ind. L.R. 56-1. The County Defendants filed a Statement of Material Facts Not in Dispute [DE 40], as required by Local Rule 56-1(a)(3).

Higgs, despite being advised to comply with Local Rule 56-1(b)(2), failed to reproduce this Statement of Material Facts verbatim and indicate for each paragraph whether he disputes the asserted fact. [DE 44.] Instead, he indicated whether he agreed or disagreed with each of the first twelve paragraphs of the County Defendants' Statement of Material Facts, *see id.* at 1–3 (paragraphs 1–12), and then submitted 22 additional paragraphs asserting facts with citations to evidence he claims creates genuine disputes of material fact as to the balance of the County Defendants' Statement of Material Facts, *see id.* at 3–8 (paragraphs 13–34). The County Defendants, in reply, responded to each of the numbered paragraphs in Higgs' Statement of Material Facts, indicating whether the facts are in genuine dispute and citing to evidence in the record. [DE 47.]

A party opposing summary judgment is obligated under Local Rule 56-1(b)(2) to file a Response to Statement of Material Facts that includes "a correspondingly numbered response immediately following each paragraph of the Statement of Material Facts" with "a citation to evidence supporting each dispute of fact." If a party wishes to provide additional facts, it must do so "in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbering of the Statement of Material Facts for each additional material fact the opposing party contends is undisputed," including a short statement of each fact and a citation to evidence supporting each fact. N.D. Ind. L.R. 56-1(b)(2)(D)(i)–(ii). These rules apply where an opposing party, like Higgs, is represented by counsel. *See* N.D. Ind. L.R. 56-1(b)(3). Higgs' response simply ignores these rules. I struggle to see why, given that he was provided specific notice of the requirement to adhere to Local Rule 56-1.

The approach taken has made it difficult for me to pinpoint just where the parties genuinely dispute facts and what evidence in the record reflects such genuine disputes. With that said, rather than striking Higgs' response, I have done my best to set forth the undisputed facts above based on the parties' submissions and designated evidence.

## Discussion

### I.    Title VII Claim Based on Higgs' Sexual Orientation

In addressing Higgs' employment discrimination claim, let's start by brushing away some of the issues not in dispute. Higgs has sued the three Commissioners—Michael Repay, Kyle Allen Sr. and Jerry Tippy—for employment

discrimination under Title VII. But as Higgs acknowledges [DE 43 at 4], an action under Title VII "must proceed against the employer as an entity rather than against a natural person." *Carver v. Sheriff of LaSalle Cnty., Illinois*, 243 F.3d 379, 381 (7th Cir. 2001). As a result, any claim against the Commissioners under Title VII will be dismissed.

Higgs claims that his termination constitutes intentional discrimination on the basis of his sexual orientation. *See generally* 42 U.S.C. § 2000e–2(a)(1). The Supreme Court and Seventh Circuit have held that Title VII prohibits intentional discrimination on the basis of sexual orientation. *Bostock v. Clayton Cnty.*, Georgia, 140 S. Ct. 1731, 1741 (2020) ("An individual's homosexuality or transgender status is not relevant to employment decisions. That's because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."). *See also Hively v. Ivy Tech Cmty. Coll. of Ind.*, 853 F.3d 339, 341 (7th Cir. 2017).

To survive summary judgment on his Title VII claim, Higgs must "point to evidence sufficient to permit a reasonable factfinder to conclude that his sexual orientation caused [his] termination." *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791 (7th Cir. 2020). *See, e.g., Perez v. Rexnord, Inc.*, 1998 WL 526571, at *4 (N.D. Ill. Aug. 17, 1998) (plaintiff "must raise inference of discrimination" to survive summary judgment, and may do so "either indirectly or directly"). Higgs does not contend that there is any direct evidence of unlawful discrimination on part of the County. In the Seventh Circuit, a plaintiff may assert discrimination claim under the burden-shifting

framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or the

approach taken by the circuit in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir.

2016).

Under *McDonnell Douglas*, "the plaintiff has the initial burden of producing

evidence showing that (1) she is a member of a protected class, (2) she was meeting the

defendant's legitimate expectations, (3) she suffered an adverse employment action, and

(4) similarly situated employees who were not members of her protected class were

treated more favorably." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 661 (7th Cir.

2016). "If the plaintiff meets each element of her prima facie case, the burden shifts to

the defendant to articulate a legitimate, nondiscriminatory reason" for the action. *Skiba*

*v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 719 (7th Cir. 2018) (quotation omitted). And if the

defendant does so, "the burden shifts back to the plaintiff to submit evidence that the

employer's explanation is pretextual." *Id.* at 719–20.

*Ortiz* takes a more holistic approach, and simply requires me to ask whether,

taking all of the employee's direct, indirect and circumstantial evidence into account, a

"reasonable factfinder (could) conclude that the plaintiff's . . . [sexual orientation]

caused the discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

Courts have recognized that while the *McDonnell Douglas* framework remains useful,

the ultimate question is simply "whether the evidence would permit a reasonable

factfinder to conclude that the plaintiff's [sexual orientation] caused the discharge or

other adverse employment action." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d

887, 894 (7th Cir. 2018). There are "three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020).

I will evaluate whether the evidence presented, taken as a whole, would permit a reasonable factfinder to conclude that Higgs' sexual orientation, rather than his job performance and attitude, led to his firing. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 574 (7th Cir. 2021); *Ortiz*, 834 F.3d at 765. The parties do not dispute that Higgs has made a threshold showing that he is a member of a protected class, namely that he identifies as homosexual. Nor do the parties dispute that his termination qualifies as an adverse employment action under Title VII. *See Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016). The core of the dispute in this case is whether Higgs' performance fell below his employer's reasonable standards, resulting in his termination. That question has bearing on his *prima facie* case, the alleged nondiscriminatory reason for his termination, and whether that reason was bogus (in other words "pretextual"). For the reasons that follow, I conclude that the evidence presented falls well short of creating a triable dispute that Higgs' sexual orientation "caused [his] discharge or other adverse employment action." *Ortiz*, 834 F.3d at 765.

As explained above in my extensive recitation of the undisputed facts presented, a wealth of evidence reflects that, from the County's point of view, Higgs was not

meeting its reasonable job expectations. While Higgs throughout his opposition brief suggests that Fech's report was based on erroneous findings about a fake story Clark cooked up and reported to the local police, there is no evidence suggesting that the individuals Fech interviewed were lying or that Fech did not reasonably believe the information documented in his report. *See See v. Ill. Gaming Bd.*, 29 F.4th 363, 368 (7th Cir. 2022) ("If the employer honestly believed its reasons for taking the challenged actions, even if those reasons were incorrect, then the reasons were not pretextual.") (citing *McCann v. Badger Mining Corp.*, 965 F.3d 578, 590 (7th Cir. 2020)).

Much the opposite, Higgs stood formally accused of repeatedly harassing a subordinate (Clark) and suspending him for no good reason. The County investigated the facts forming the basis of Clark's complaint and the police report. In the course of that investigation, Higgs provided information about the 'vomit incident' that Fech reasonably determined to be false based on a report signed by a judge, which stated that another employee, not Higgs, had cleaned up the mess. Fech concluded that the judge's report "directly contradict[ed]" what Higgs said during his witness interview. That finding undermined Higgs' credibility in refuting Clark's allegations. This information was coupled with statements Fech obtained from judges about the quality of Clark's and Higgs' job performance. The judges interviewed conveyed that Higgs was "frequently absent" and "not reliable" when needed; by contrast, the judges with whom he worked provided favorable comments about Clark's job performance. Based on his investigation, Fech concluded that Higgs should be let go.

18

Higgs does not present any evidence disputing that Fech personally interviewed him and Clark; that Clark had a video recording of a conversation reflecting that Higgs had violated Lake County rules by changing Clark's schedule without due notice; or that Higgs would routinely pester Clark about where he parked (which led Fech to reasonably credit Clark's allegation that Higgs was "following" him). Fech's investigation and memorandum were submitted to the Board of Commissioners, which directed Fech to terminate Higgs' employment. In short, there's not even a whiff that Higgs' sexual orientation had anything to do with Fech's decision to recommend his termination, let alone the Commissioners who made the ultimate call based on that recommendation.

What's more, Higgs provides no evidence of any similarly situated employee given more favorable treatment, which is one aspect of his initial burden to establish a *prima facie* discrimination claim. *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 750–51 (7th Cir. 2006). *See also Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (in order for an individual to be similarly situated to the plaintiff, the plaintiff must show that the individual is "directly comparable to her in all material respects").

Higgs, for his part, suggests that there is a smoking gun that blows a hole in these uncontroverted facts. An administrative decision issued December 6, 2021 by the Indiana Department of Workforce Development after a hearing before an Administrative Law Judge plays a starring role in his opposition brief. Following his termination, an ALJ determined that Higgs was entitled to unemployment insurance

benefits. [DE 46-8; DE 46-9] The decision states (without further explanation) that Lake County terminated Higgs "on October 13, 2020 for violating [its] policy regarding sexual harassment." [DE 46-9 at 2.] The ALJ noted that Fech conducted an investigation after an employee grievance was filed against Higgs, prompting Lake County to terminate him "for violations of the sexual harassment policy," and that the "repetitive nature of the behavior constituted a Category IV violation" that "could lead to immediate termination of employment" under the County's policy. *Id.* The ALJ credited Higgs' "firsthand testimony" that "he did not engage in any of the conduct that [Lake County] described as having violated the sexual harassment policy," and found that "[t]here was no credible firsthand evidence or testimony presented [in the proceeding] by anyone who witnessed the alleged behavior." *Id.* at 4. Based on these findings, the ALJ concluded that Higgs "did not knowingly violate [Lake County's] rule prohibiting sexual harassment." *Id.* Because the ALJ found that Higgs "was discharged but not for knowingly violating a reasonable and uniformly enforced rule," it followed that he was not fired "for just cause," as defined by Indiana law, so he was entitled to unemployment insurance benefits. *Id.*

Defendants argue that I should not consider this decision and the embedded findings for purposes of summary judgment, for two reasons. First, Indiana law specifically provides that any factual determinations made as a result of an unemployment compensation benefit proceeding have no preclusive effect in other proceedings. *See* Ind. Code § 22-4-17-12. In *University of Tennessee v. Elliott*, 478 U.S. 788

(1986), the Supreme Court held that the provision in Title VII directing the Equal

Employment Opportunity Commission to give "substantial weight" to filings of state

administrative bodies, *see* 42 U.S.C. § 2000e–5(b), reflected "Congress' intent that

common law issue preclusion does not apply to the findings of such bodies." *See Pernice*

*v. City of Chicago*, 237 F.3d 783, 787 n.5 (7th Cir. 2001) (citing 478 U.S. at 795–96) (holding

plaintiff was not bound by state personnel board's finding that he was discharged for

drug possession in ADA case, noting "*Elliott*'s reasoning applies equally to ADA cases"

(internal citation omitted)). More to the point, the Seventh Circuit, reviewing an

analogous provision of Illinois law,[2] has held that a plaintiff may not rely on findings

issued in an unemployment compensation proceeding because they are "*not admissible*

in federal civil actions,*"* and therefore do not "create a genuine issue of material fact as

to the motivations for [the plaintiff's] discharge." *Khungar*, 985 F.3d at 576 (emphasis

added) (internal citations omitted).

 Second, the findings in the decision are inadmissible under Federal Rules of

Evidence 802 and 901, because the documents contain hearsay and are not

---

[2] Section 1900(B) of the Illinois Unemployment Insurance Act expressly provides that decisions of benefits hearings are not admissible in any other action: "No finding, determination, decision, ruling or order (including any finding of fact, statement or conclusion made therein) issued pursuant to this Act shall be admissible or used in evidence in any action other than the one arising out of this Act, nor shall it be binding or conclusive except as provided in this Act, nor shall it constitute res judicata, regardless of whether the actions were between the same or related parties or involved the same facts." 820 ILCS 405/1900(B). The relevant provision under Indiana law is essentially identical: "Any finding of fact, judgment, conclusion, or final order made by a person with the authority to make findings of fact or law in an action or proceeding under this article is not conclusive or binding and *shall not be used as evidence in a separate or subsequent action or proceeding between an individual and the individual's present or prior employer in an action or proceeding brought before an arbitrator, a court, or a judge of this state or the United States* regardless of whether the prior action was between the same or related parties or involved the same facts." Ind. Code § 22-4-17-12 (emphasis added).

authenticated. To defeat summary judgment, Higgs must rely on admissible evidence.
*See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 704 (7th Cir. 2009) ("To defeat a
summary judgment motion . . . a party may rely only on admissible evidence.");
*Schindler v. Seiler*, 474 F.3d 1008, 1010 (7th Cir. 2007). In sum, because the documents
Higgs has proffered from his unemployment compensation proceedings are not
admissible evidence, they do not create a genuine dispute as Defendants' motivations in
terminating his employment or his job performance.

Setting aside the administrative decision and its findings, Higgs also points me to
testimony that purportedly reflects Defendants' "shifting and inconsistent reasons" for
his termination. [*See* DE 45 at 7.] Defendants respond that there is no triable dispute that
they have "been consistent that his discharge occurred because of his harassment of
Lawrence Clark, including showing up at Clark's home uninvited." [DE 48 at 8.] To
show pretext, Higgs must "produc[e] evidence from which a rational factfinder could
infer that the [employer] lied about its proffered reasons for his dismissal or that the
company's proffered reasons do not represent the truth." *O'Connor v. DePaul Univ.*, 123
F.3d 665, 670 (7th Cir. 1997). He can do so by showing the proffered reason for his
termination has no basis in fact, that the proffered reasons did not actually motivate the
termination, or that the proffered reasons were insufficient to motivate the termination.
*See id.* Higgs' cited evidence falls short of creating a material dispute as to whether the
County's proffered reason for his termination was pretextual. *See, e.g.*, *Perez*, 1998 WL
526571, at *6 (granting summary judgment on discrimination claim where plaintiff

terminated for violation of employer's sexual harassment policy was "unable to produce evidence that this conclusion had no basis in fact, did not actually motivate [the employer's] decision or was insufficient to motivate the termination decision").

First, Higgs points to testimony from Repay's deposition, where Repay was asked whether Higgs' work was "unsatisfactory," and Repay replied, "No." [DE 46-11 at 4.] Repay continued by saying that he believed "the reasons for the termination . . . were put in a memo to the employee," and he did not recall "what the written reasons were that were put into that document." *Id.* Repay later in his deposition stated that he did not recall any of the Commissioners objecting to the recommendation Fech provided, and that when an individual in Higgs' position is terminated, the process consists of the Commissioners taking "advice from staff, including the attorney, and if there's no objection, staff and/or the attorney carries out the recommendation." *Id.* at 6–7. In context, it is clear that while Repay stated that in his view, Higgs' work was not "unsatisfactory," the reasons stated in the memorandum, based on the findings of Fech's investigation, formed the reason for Higgs' termination.

Next, Higgs testified that in his February 2020 meeting with Repay, Repay specifically stated that the reason Higgs should not run is "because everybody knows [you're] gay." [DE 46-13 at 8.] This statement, viewed in the light most favorable to Higgs, is troubling. But it does little to help his claim that the decision to terminate his employment some *eight months later* was based on animus about his sexual orientation. While it would be improper, at this stage, for me to discredit Higgs' testimony about his

interaction with Repay in February 2020 based on its "'self-serving' nature," *see Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013), there is no evidence suggesting that this statement had anything to do with Fech's employment investigation, his recommendations, or the Commissioners' directive to terminate Higgs for cause. While in isolation this stray remark appears to be a red flag, in the context of Higgs' discrimination claim it is simply a red herring.

In sum, perhaps the conclusions that Mr. Fech drew from his investigation into Higgs were erroneous. But whether they were correct or not, there is no evidence that they were an intentionally phony, ginned up excuse to terminate him for invidious reasons. And in the absence of that kind of evidence, it's not my prerogative to secondguess routine employment decisions made by employers. Higgs' Title VII claim will therefore be dismissed with prejudice.

## II.      Fourteenth Amendment Due Process Claim

Higgs asserts two claims under 42 U.S.C. § 1983, which codifies a cause of action for deprivation of constitutional rights "under color of state law" committed by a "person." He first claims that all three of the Commissioners and the County violated his due process rights.

Defendants note that because Higgs was an at-will employee, there is no dispute that he lacked a property interest in his position of which Defendants could have deprived him when he was terminated. *Lawson v. Sheriff of Tippecanoe Cnty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984). *See also Moulton v. Vigo County*, 150 F.3d 801, 804–05 (7th

Cir. 1998). *See also Montgomery v. Stefaniak*, 410 F.3d 933 (7th Cir. 2005). Moreover, "the interest that is invaded by defamation, like the interest in employment at will, is not 'property' or 'liberty' within the meaning of the due process clause." *Lawson*, 725 F.2d at 1138 (internal citations omitted). *See also Paul v. Davis*, 424 U.S. 693, 706 (1976) (noting that the "mere defamation of an individual," without a showing of a change in legal status, is insufficient "to invoke the guarantees of procedural due process"); *Olivieri v. Rodriguez*, 122 F.3d 406, 408 (7th Cir. 1997).

It appears Higgs has abandoned any pretense that he has a property interest in his at-will position. Rather, he summarizes the basis for this claim (he calls it a "liberty interest due process claim") by stating that he was "fired based on false accusations"; prior to his termination, he was "not provided notice and an opportunity to be heard regarding the false accusations"; and shortly after he was fired, "a memorandum of law was released to the press which regurgitated the false accusations." [DE 45 at 9–11.]

The parties dispute application of the relevant case law on point. Here's a quick distillation of what Higgs must show to proceed on this claim. An employee's "termination" and an "announcement of the termination," standing alone, does not infringe a Fourteenth Amendment liberty interest. *Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1349 (7th Cir. 1995). However, courts have recognized a deprivation of a plaintiff's liberty "when the employee was fired for a publicly announced reason that impugned his moral character." *Lawson*, 725 F.2d at 1138–39 (collecting cases). It is the "alteration of legal status"—"such as governmental deprivation of a right previously held"—in

conjunction with an "injury resulting from . . . defamation" that may infringe a public employee's due process rights. *Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 617 (7th Cir. 2002) (quoting *Paul v. Davis*, 424 U.S. 693, 708-09 (1976)).

This standard is commonly referred to as the "stigma-plus" test. *Schepers v. Comm'r, Ind. Dep't of Corr.*, 691 F.3d 909, 914 (7th Cir. 2012). In sum, to prevail on a claim that a government employer has infringed his occupational liberty interest, the plaintiff must show that "(1) he was stigmatized by the defendant's conduct, (2) the stigmatizing information was publicly disclosed and (3) he suffered a tangible loss of other employment opportunities as a result of public disclosure." *Townsend v. Vallas*, 256 F.3d 661, 669–70 (7th Cir. 2001) (citing *Head v. Chicago Sch. Reform Bd. of Trustees*, 225 F.3d 794, 801 (7th Cir. 2000); *Strasburger v. Board of Educ., Hardin County Cmty. Unit Sch. Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998)*; Johnson v. Martin*, 943 F.2d 15, 16 (7th Cir. 1991)). The circuit has explained that this is a high bar: an "employee's good name, reputation, honor or integrity must be called into question in a manner that makes it *virtually impossible* for the employee to find new employment in his chosen field." *Townsend*, 256 F.3d at 670 (emphasis added). *See also Munson v. Friske*, 754 F.2d 683, 693 (7th Cir. 1985) ("A liberty interest is not implicated where the charges merely result in reduced economic returns and diminished prestige, but not permanent exclusion from or protracted interruption of employment.").

Higgs bears the burden to demonstrate a triable dispute as to each of the above elements of his stigma-plus claim. But he has failed to create a genuine triable dispute

that he has suffered any tangible harm as a result of the public disclosure of the grounds

for his termination. The stigma-plus line of cases derives from the Supreme Court's

ruling in *Paul v. Davis*, in which the Court confirmed that the "mere defamation of an

individual," without a showing of a change in legal status, is insufficient "to invoke the

guarantees of procedural due process." 424 U.S. at 706. In *Bishop v. Wood*, the Court

reiterated that there is no liability under the stigma-plus test "when there is no public

disclosure of the reasons for the change." 426 U.S. 341, 348 (1976). As the Seventh

Circuit has explained, the "classic case" of government defamation in this context is a

situation where the government creates a "blacklist, which when circulated or

otherwise publicized to prospective employers *effectively excludes the blacklisted*

*individual from his occupation*, much as if the government had yanked the license of an

individual in an occupation that requires licensure." *Olivieri*, 122 F.3d at 407–08

(emphasis added) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 573 (1972); *Joint Anti–Fascist*

*Refugee Comm. v. McGrath*, 341 U.S. 123 (1951); *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th

Cir. 1987)).

  The evidence before me bears no resemblance to the specter of an employee

blacklisted from public employment. At this stage of the case, Higgs bears the burden to

come forth with evidence that he has suffered a "tangible loss of other employment

opportunities" due to Defendants' asserted public disclosure, meaning that "because

the charges have been made, it is unlikely that anyone will hire him for a comparable

job in the future." *Townsend*, 256 F.3d at 669–70 & n.9. As succinctly explained by Judge

Posner in *Lawson*, a plaintiff's liberty interest in the context of public employment "must not be confused with the right to a job" –  rather, "if a state *excludes a person from a trade or calling*, it is depriving him of liberty, which it may not do without due process of law." 725 F.2d at 1138–39 (emphasis added). Higgs has failed to meet this burden. The undisputed facts reflect that Higgs, after his termination, applied to two positions that were not in facility maintenance and "looked around at a couple of places." [DE 46-13 at 4–5.] Then he stopped looking for work. In addition, there is no evidence in the record, beyond Higgs' suspicions of animus in the political establishment of Lake County, that meaningfully supports an inference that he has suffered "a tangible loss of other employment opportunities" in the political arena. In fact, since he was fired, Higgs won reelection as a precinct committeeman in May 2022. And he continuously held that position for three decades, notwithstanding the publication of the basis for his termination. [DE 38-1 at 12.]

In sum, because Higgs has failed to show that it is "virtually impossible" for him to find work in his chosen field, Defendants are entitled to judgment on Higgs' "stigma plus" due process theory.

### III.    First Amendment Retaliation Claim

Let's turn to Higgs' other § 1983 claim – that Repay unlawfully retaliated against his exercise of First Amendment rights. "[A] public employee does not shed his First Amendment rights at the steps of the government building." *Vargas–Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir. 2001). *See also Perry v. Sindermann*, 408 U.S.

593, 597 (1972). As a "general rule," public employers "may not respond to their employees' protected activity with actions aimed to deter that activity." *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). To make out a prima facie case of First Amendment retaliation, Higgs must produce evidence sufficient to create a triable dispute that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter free speech, and (3) his speech was at least a motivating factor in the employer's action. *Id.* (citing *Spiegla v. Hull*, 371 F.3d 928, 935, 940–41 (7th Cir. 2004)).

Defendants assert that Higgs has presented no evidence supporting a First Amendment retaliation claim. Higgs, in opposition, points to his decision in January 2020 to run for state representative in the election held in May 2020. While he does not say so explicitly in his memorandum opposing summary judgment, it appears that he asserts that telling Repay about his decision to file for election as state representative in February 2020 was expression protected under the First Amendment, and that he was terminated as a result – a "deprivation likely to deter" his expression.

The Seventh Circuit has held, in construing claims at the pleadings stage, that a "fatal infirmit[y]" for a First Amendment retaliation claim predicated on a right to run for public office is that there's "no constitutional right to run for public office and hence retaliation for its exercise could not itself be actionable under section 1983." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982). However, the circuit has permitted claims to proceed where they were based on an official "firing plaintiff because [he] disapproved

of plaintiff's candidacy," because the firing "represent[s] punishment by the state based on the content of a communicative act." *Newcomb v. Brennan*, 558 F.2d 825, 828 (7th Cir. 1977).

Even assuming without deciding that Higgs has established the first two prongs of the test, he has not come forth with any evidence showing that his asserted protected activity was a motivating factor in his termination. That is fatal to his claim under § 1983 for deprivation of his First Amendment rights. Defendants focus their argument on this prong of the analysis, noting there is no direct evidence that Repay instructed Fech to terminate Higgs' employment because he told him he intended to run for office in February 2020 and then ran in and lost the election in May 2020. Higgs, for his part, points me to the aforementioned statement he claims Repay made in February 2020, where Repay stated that Higgs should not run against an incumbent for state representative because "everybody" knew he was gay. [DE 46-13 at 8; *see* DE 38-1 at 19–20.] He then connects the dots, arguing—without citing any other evidence in the record—that the "defamatory article was [published] as a direct result of Higgs not obeying Commissioner Repay's instruction not to run for office." [DE 45 at 14.] But this case is at summary judgment, and allegations are not evidence.

In some cases, a causal connection between protected speech and an employee's termination may be inferred based on "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350, (7th Cir.

2009). But this is not one of them. A significant amount of time elapsed between Higgs'

discussion with Repay and his termination. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966

(7th Cir. 2012) (courts "typically allow no more than a few days to elapse between the

protected activity and the adverse action" to raise inference of causation); *Loudermilk v.*

*Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) ("Suspicious timing may be just

that—suspicious—and a suspicion is not enough to get past a motion for summary

judgment."). Moreover, there is no evidence suggesting Repay said or did anything to

Higgs in connection with his decision to file and run for office in the meantime, and

there is no evidence that anything like this occurred between Repay and any other

employee.

For the foregoing reasons, Higgs has failed to come forth with evidence sufficient

to create genuine disputes as to an essential element of his § 1983 claim for deprivation

of his First Amendment rights. Defendants are therefore entitled to judgment on the

claim.

###    IV.    Defamation Under Indiana Law

The parties agree that I have subject matter jurisdiction over the federal law

claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the defamation

claim pursuant to 28 U.S.C. § 1367(a). [DE 1 at 1; DE 7 at 1; *see* DE 54 at 2.] Higgs has not

asserted at any point in this case that his state law claim may proceed under the Court's

diversity jurisdiction. *See* 28 U.S.C. § 1332. With all of the federal claims having now

been dismissed, I will exercise my discretion and relinquish jurisdiction over the

supplemental state law claim of defamation. *See* 28 U.S.C. § 1367(c)(3). That is the

"general presumption" that courts should follow when all federal claims have gone by

the wayside. *RWJ Management Co. v. BP Products North America, Inc.*, 672 F.3d 476, 478

(7th Cir. 2012). Any statute of limitations concern that Higgs may have about being

prevented from refiling his defamation claim in state court is ameliorated by Indiana's

"generous Journey's Account Statute, which allows additional time for refiling an action

if a previous action has failed." *Chicago v. United States Steel Corp.*, 2023 WL 6037395

(N.D. Ind. Sept. 15, 2023) (citing Ind. Code § 34-11-8-1).

   As noted above, the defamation count is Higgs' sole claim against Lawrence

Clark. [DE 1, ¶¶ 44–52.] Clark has not appeared and the Clerk has entered a default

against him [DE 31; DE 32; DE 33], but the technical default has not been reduced to a

default judgment. *See supra* n.1. In exercising my discretion under § 1367(c)(3), the

circuit has identified "certain circumstances that may displace the presumption" to

relinquish federal jurisdiction over any supplemental state law claims. *RWJ Management

Co.*, 672 F.3d at 480 (citing *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514–15

(7th Cir. 2009)). These include situations in which: "(1) the statute of limitations has run

on the pendent claim, precluding the filing of a separate suit in state court;

(2) substantial judicial resources have already been committed, so that sending the case

to another court will cause a substantial duplication of effort; or (3) when it is absolutely

clear how the pendent claims can be decided." *Sharp Elecs. Corp.*, 578 F.3d at 514–15.

I've already addressed the statute of limitations issue. From an efficiency standpoint, I see no reason to hold onto the defamation claim simply because the Clerk has entered a default against Clark. Entry of default, as opposed to a default judgment, is a straightforward exercise. I simply sized up whether Higgs effected service of process and whether Clark had failed to appear and defend the case. In other words, the default entered against Clark did not consume substantial judicial resources. Moreover, it doesn't have any bearing on the merits of the defamation claim; it's not a judgment. Higgs may not have the benefit of an entry of default against Clark in a newly filed state court action. But if he re-files his defamation claim in state court, he can do so against all four of the defendants, rather than proceeding in two parallel cases. And if Clark again fails to appear, he can obtain default through the state court process and seek to reduce the default to a judgment on the merits, along with the claims against the other three defendants, all in one forum. In short, none of the circumstances cited by the circuit apply in this case to displace the presumption that I should relinquish jurisdiction over Higgs' supplemental state law claim against Clark, simply because he failed to appear and is presently in default.

In sum, I'll decline to exercise supplemental jurisdiction over the remaining state law claim of defamation, having previously concluded that all of Higgs' federal law claims must be dismissed on the merits. Because this is the sole claim currently pending against Clark, he will also be dismissed as a defendant in this case. Of course, Higgs

remains free to pursue this state law claim against Clark and any other individuals who allegedly defamed him in the appropriate forum.

### Conclusion

For the reasons explained in this Opinion and Order, the Motion for Summary Judgment [DE 39] filed by Defendants Michael Repay, Kyle Allen Sr., Jerry Tippy, and Lake County is **GRANTED**, as follows:

(1) The federal claims (Counts I–III) against Repay, Allen, Sr., Tippy, and Lake County are **DISMISSED WITH PREJUDICE**.

(2) Higgs' claim for defamation under Indiana state law (Count IV) is **DISMISSED WITHOUT PREJUDICE**.

(3) The Clerk is **DIRECTED** to close this case.

**SO ORDERED**.

ENTERED: February 14, 2024.

 /s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT